Good afternoon. This is the hearing in Ninth Circuit Docket Number 14-80134, in re. MARILYN S. SCHEER. A hearing requested by Ms. Scheer in response to the Ninth Circuit's order to show cause why the Ninth Circuit should not impose reciprocal discipline based on discipline imposed by the State of California. All right. So, Ms. Scheer, would you mind stepping to the podium? Okay. Although this is a gorgeous and smallish courtroom for the courtrooms in this building, the acoustics are not great. And we are recording the proceedings today. So it would be helpful for me to hear you as well as for the recording equipment for you to use the microphone in today's proceeding. And I did want to make sure you are aware that you're entitled to be represented by counsel at this proceeding. Do you understand that? Yes, Your Honor. And you choose to represent yourself? I have no choice. All right. In the course of the proceedings today, I may ask questions of you. And so I would like at this time to have you sworn in so that we can create a record. And I'm going to have my courtroom deputy administer the oath. Yes, I do. All right. So I want to make sure that you understand. And we all understand the scope of what we're doing here today, the nature of the reciprocal proceedings. What we are addressing today is solely your status to practice at the Ninth Circuit. We're not reviewing any decision that has been made by any other jurisdiction. So nothing that occurs in this proceeding could directly affect your ability to practice in California or in any other court solely in the Ninth Circuit. Do you understand that? Yes, Your Honor. And I also want to make sure you understand the scope of the inquiry that the court is making here. It's not a de novo review. We accord the determination of the California State disciplinary proceedings great deference, absent clear and convincing evidence that you have the burden of shouldering. One of three factors is evident. First, that the state procedure did not provide you with adequate notice and an opportunity to be heard, a due process notion. Second, that the proof of facts underlying the disciplinary decision in the state court was so infirm that this court should not accept the state court's decision, sort of a sufficiency of the evidence type of inquiry. And third, whether some other grave reason exists to prevent the court from recognizing the state court's determination, sort of the catch-all phrase. So that's the scope of the inquiry. And I have reviewed the state court determinations, and I have looked at your response to the order to issue a cause and your supplemental declaration, and I'm generally familiar with your arguments. But you've requested a hearing, and I do want to give you an opportunity to emphasize any points that you think you can, you wish to make at this stage within reason. And I'm going to have some questions of you as well. So let me ask you before we go further whether you intend to present any evidence today. No, Your Honor, that's the part I wasn't clear on. What I could gather from the Ninth Circuit website and the order that was issued, I thought this would be pretty much in the nature of oral argument, and that's the way I prepared it. And that typically is the case. So do you have a sense of how much time you are going to require? Your Honor, I'm nothing if not efficient, and I don't think I would need more than 30 minutes. And, of course, if the court has questions, which I certainly welcome, it might go a little bit longer than that. All right. Well, maybe I will just let you proceed then, and maybe you'll answer all my questions. Your Honor, if I could bring my material up. Certainly. I'm so impressed by this courtroom. It's just stunning. This is not even the most impressive courtroom in the building. That's what I understand. Your clerk told me courtroom one, is it? Yes. But this is the most intimate. This was the original Court of Appeals courtroom when this building was first constructed. The other courtrooms were all district court, trial court courtrooms, but this is the original one, and I like it for that reason. May I please record? Yes. Marilyn Scheer of Hearing Pro Se, and Scheer is S-C-H-E-E-R. I'd like to thank the Ninth Circuit for allowing me an oral hearing. I have not been so fortunate before other courts. I am here due to the order of the California Supreme Court, which signed off on an erroneous decision of the Review Department of the California State Bar, suspending my law license. The State Bar Courts are not constitutional courts under the California Constitution. They are creatures of the State Bar and administrative agency. My petition for judicial review was denied by the California Supreme Court on July 16, 2014, in one sentence. The petition for review is denied. Under California Rule of Court 9.16b, denial of review is deemed a judicial determination on the merits, by allowing the decision of the State Bar Court to be deemed a judicial determination on the merits, because it becomes an order of the California Supreme Court. Excuse me. Now, if I'm correct, this argument is also raised in your appeal from the Arbitration Administrative Hearing. Am I correct on that? Yes, Your Honor. I am attacking Rule of Court 9.16 in every venue I can. Right. Okay. So from my perspective about that argument, my sense is that the three-judge panel that's going to hear the merits of that issue is going to take precedence over anything I do. So I don't think I'm going to rule on that particular point until the Court resolves your appeal. Do you understand my position on that? Yes, Your Honor. Because I don't want to run into the situation where I come out one way and then a three-judge panel, which obviously is going to be more authoritative than I will, comes out another way. No, I fully suspect that to be the case, Your Honor. However, my 9.16 argument is so intertwined with my argument for lack of due process. Right. Because without judicial review, without a valid order from the California Supreme Court providing me with judicial review, my license would not be suspended because it's only by virtue of the order from the California Supreme Court that my license was suspended. And my argument is I did not receive due process. I probably cannot make my argument more succinctly than I did in my petition for writ associary if the Court reviewed that. Yes. But that, again, that issue will be squarely before the three-judge panel, correct? Am I correct? Well, I'm trying to get it squarely before them. My argument is I have not received judicial review. And California rule of court 9.16 is unconstitutional. And if it is found unconstitutional, my license is not suspended because it's only by virtue of 9.16 that the order of the review department has any merit. Did you raise the jurisdictional issue in the state bar court and review department litigation at those levels? Yes, Your Honor. Okay. They did not even mention Barron in the decision. There are huge holes in Judge Remke's review department decision. And I know this Court doesn't want to relitigate that. And that's why I understand the limited scope here. Yet I'm caught in what I call a bureaucratic box. Because I raised those issues before the California Supreme Court. But the California Supreme Court does not take attorney appeals from the review department. And as I argued in my petition for certiorari, attorneys are the only licensed professionals in this state who are treated that way. Every other licensed professional in this state has the right to go into California State Court and challenge any adverse agency action against their license. Astonishingly, attorneys in this state are the only ones who do not have that right. They are subjected to agency level. I was subjected to the decision of three review department judges. I would just like to reiterate that the state bar court is not a large court. There are five hearing department judges and three review department judges. All attorney appeals seem to stop at three review department judges.  You have three judges. You have three people deciding the fate of almost 250,000 members of the California State Bar. It is astonishing. There is no judicial review. I also question, and as I did in my petition for certiorari, the appointments process to the state bar court. Only two of the judges are actually appointed by the California Supreme Court. The others are political appointments. Judge Rimke was a political appointment to the review department. She was the author of my decision. And she was appointed by State Senator John Burton in the year 2000 when she had been an active member of the state bar for a little over five years. The minimum requirement is five years as an active member of the state bar. She had only been out of law school eight years. John Burton had state law changed so that as head of the Senate Rules Committee, he could appoint her to the court in 2000. Her judicial profile and her state bar profile show that she had minimal or no litigation or private practice experience. Yet she was called upon and did pass on my license and the license of many others in the state in the absence of meaningful judicial review. Putting a judge in the front of someone's name does not make them infallible. And here the California Supreme Court has conveniently looked the other way and allowed decisions concerning a valuable property right, someone's license to practice law to be determined by three political appointments, three administrative law judges. It is astonishing. I argue, too, that the California Supreme Court, by adopting California Rule of Court 9.16B in 1991, has not by statute, but by court rule, violated not only the First Amendment and the 14th Amendment, it's also violated California law. It has violated the procedural protections granted to attorneys in the state. Business and Professions Code 6087 says that there shall be review by the California Supreme Court. Article 6, Section 14 of the California Constitution, that all causes coming before the California Supreme Court should provide a reasoned, written decision after oral argument. The California Supreme Court, in adopting 9.16B, has completely ignored the procedural protections granted to me as an attorney in this state. Now, was the California Supreme Court just unaware of these constitutional violations? I think not. Justices Kennard and Brown, in two very spirited dissents in the Onrose case, brought that directly to their colleagues' attention. And Justice Brown, particularly, was astonished, and I have to say disgusted, by the court's ruling in that case. She called the procedure efficient, but not pretty, and that it seems like anything, anything will pass constitutional muster. Is that what due process has come to in this state? I hope not. Yes, I have challenged California Rule of Court 9.16B in my disciplinary case. I have challenged it in the related case that this court has referred to. I will challenge it in every way I can think possible. My career is virtually over. But thus far, to my knowledge, my research hasn't shown it. No one has had the will, the courage, or the resources to challenge this rule on constitutional grounds. And I will continue to challenge it with every breath in my body, and penny in my pocket, and I don't have very many pennies left in my pocket. But I will do whatever I can to preserve the constitutional rights of the attorneys in this state. Because what we have here is an administrative agency with no accountability. My first attorney, when I had the money to retain counsel, was Scott Drexel, who was former chief trial counsel of the California State Bar. And Mr. Drexel said to me, he said, the California State Bar often tramples on the due process rights of its members. And why not? And I said, well, what's going to happen? Who do you go to complain to? There is no one to complain to. Because what you have here is an agency who defers to the State Bar. In my case, Judge Epstein, a member of the review department when I had my oral hearing before the review department, three times she referred to an enhanced fee. An enhanced fee wasn't even an issue in my case. The review department has become so jaded and fixated that anyone involved with the loan modification process is evil or corrupt that a fair and impartial determination was impossible. The review department has taken that position because that is the State Bar's position. Now, that hardly means that the review department is comprised of impartial decision makers. It is a biased administrative agency. That is why judicial review, meaningful judicial review, is so important. This may be exceeding the scope, and if it is, I'm sure Your Honor will cut me off. But I challenged Civil Code 2944.7 before the review department. That section should have been analyzed under strict scrutiny because important fundamental rights under the First Amendment were involved. The review department disposed of my constitutional arguments in one paragraph based on rational basis. They failed to apply the correct constitutional analysis. I made a challenge based on vagueness and over breadth, completely ignored. No mention of it even in the opinion. The review department engaged in faulty statutory construction. In fact, the authors of the California Practice Guide on Professional Conduct found the review department's statutory construction of Civil Code 2944.7 erroneous. It was so blatantly wrong that the authors felt compelled to comment on it in the practice guide. They boldly stated the review department got it wrong. Could you repeat that point? Who said that? The authors of the California Practice Guide on Professional Conduct, and I can give you the citation to that. It's 11 colon 1108.5. What are you citing to? The California Practice Guide on Professional Conduct. And what's the section again, 11 colon? 1108.5. 11 colon 1108.5? 1108.5. And what does that say? Well, basically... And this is with specific reference to 2944.7? Correct. Correct. Because in a decision called Slazi-Taylor, the review department... I know that decision. Okay. I know the part of it that you're referring to, but what... Was this practice guide issue obviously after Taylor? Yes. And they disapproved of Taylor? They basically flat out said that the review department got it wrong. Now, poor Mr. Taylor. I'm sorry. I'm sorry. This is an interesting question. Who issues the California Practice Guide on Professional Conduct? Well, I think there are three practitioners. It used to be Alan Peck, and I apologize, Your Honor, for not having those names. My ability to do legal research is somewhat hampered. It's one of those practice guides. So I... Yeah. Okay. Fine. These are... These are not just ordinary lawyers. These are four, and I believe one's a judge. They're four outstanding individuals in the field. Okay. And I use that just as an example because it has a bearing on my case, but it also shows what happens when the review department gets it wrong. I know Mr. Taylor. I know for a fact because I checked on his case. He petitioned the California Supreme Court for review. His petition for review was denied. So what recourse do the attorneys have? To file a petition for certiorari with the U.S. Supreme Court, as I did? And, of course, the U.S. Supreme Court receives something like 5,000 petitions for writ every year, and they accept 100. Well, I was hardly surprised that my petition for writ of certiorari was denied, but I had to try. I had to give it a shot because if I didn't, for sure the answer was no. So attorneys in this state are... were boxed into bureaucratic limbo because what happens when the three review department judges get it wrong? What recourse does an attorney have? There is really no recourse. Is that due process? Is that in accord with Business and Professions Code 6087? Is that in accord with Article VI, Section 14 of the California Constitution? Is that in accord with my right to petition under the First Amendment and the Due Process Clause of the Fourteenth Amendment? The convenience of the California Supreme Court is hardly a compelling state interest justifying the denial of attorneys' due process rights. Due process should not only be observed when it is convenient for the court to do so. If that's the standard, it would make a mockery of our entire Constitution. California's system for disciplining attorneys is unique. The State Bar Court, the creature of the State Bar, and its judges are all unique.   My contention, it is a closed, inherently biased system with no accountability or review by another body. State Bar Courts can do pretty much whatever they want without fear of comment or correction because there's no accountability. The State Bar Courts boast of their system of independent professional judges on their official website. As I said, there are eight of them. Five review, three review department judges and five hearing department judges. But what I've encountered is that the State Bar Courts engage in assembly line adjudication of claims. They can get away with it because there's no accountability. The California system has been around for the last 25 years yet no other state has followed California's lead. And there's a good reason for it. Sorry to interrupt. Go ahead. The thought keeps occurring to me about whether the issues that you raise now are ones that I can rule on or at least rule on now while your other case is pending. So I'm wondering if I could just take a moment to clarify the scope of the appeal in your other case pending in the Mad Circuit or the one concerning the administrative proceeding in the arbitration where you've briefed this issue. Thank you. So let me just get a little background. So just so that I understand where you're at now in your argument, you've been making a number of arguments about the problems with the California disciplinary system in terms of the process, the organization, all of that. So let me backtrack a little bit about this, about your case and how it came about. So let me understand how the state bar's investigation began in the loan modification case. And how did it begin and was it prompted by complaints filed against you by clients? Yes, Your Honor. And so describe what complaints those were. Okay. Clients are not always truthful with their attorney. A lot of these people obtained their loans on stated income without any backup as far as the wherewithal to repay their loans. They were playing fast and loose with the system. And they thought they could play fast and loose with the loan modification process as well. That is one type of client who filed a complaint against me because I didn't conduct forensic audits of my clients. I believed them when they told me a certain set of facts and I proceeded on that basis. Well, the lenders have, they've wised up. So they do checks now to make sure if what the borrower says is true. Okay. So they would often get rejected because of that. Not to my fault, but through their misrepresenting their financial situation. Okay. I did the work, but through the client's own actions, they were denied a loan modification. That's one type of client. Another type of client was the client who we worked, we worked, we worked. And this is a very, very labor-intensive process because back in 2008, 2009, 2010, lenders were extremely disorganized. And it was horrendous. I mean, they just had warm bodies to take the calls. And files were getting lost, documents were getting lost. You'd have to send things in time and time again because they weren't properly staffed. So you had people who after a year or two decided to throw in the towel and then they'd want their money back. Well, I've done all this work. You can't give people back their money when you've done all this work. That's the second type of client. And then you had people who would interfere with the process. The game lenders like to play as divide and conquer. They would often call clients to try to get some information out of them and try to create a discrepancy as a basis for denying a loan modification. After working in the process for a while, you get on to the lender's ways on how they try to tube loan modifications. But some people would call up the lender and they'd either get confused or they'd give the lender information they really shouldn't and they kind of tubed their own. I call it interfering with the process. They kind of tubed their own loan modification. So there were several examples, types of clients. And I say the clients themselves caused their own failure to get a loan modification. How many complaints were filed against you? Thirty. Thirty. Are those the 30 that are listed in the review department decision? Correct. Okay, four were from California, 28 or? 26. Two were dismissed, I guess. But yeah, 26 from other states. But as you'll notice, there were no performance allegations made against me because unlike other people associated with loan modifications, I did not take people's money and not do the work. I did the work. And I tried to comply with 2944.7. I didn't just say, oh, this law is unconstitutional and go on my merry way. I tried to interpret it to allow for its constitutionality. So tell me, that interests me. So you had some contracts that were in effect before that statute passed, correct? Yes. And then the statute passed. Correct. And you were aware that the statute was being passed during that business, right? Right. But I did not interpret the statute. So what did you do when this came out? First of all, I've been in practice for 30 years. And I never had a complaint filed against me. So I don't do things seat of the pants. I researched the statute very carefully. And when it talks about compensation, I did not consider putting client funds in your trust account compensation. It's not considered compensation until you draw down on it and apply it to your fees. If it had been compensation, and I made this argument, if all the funds that attorneys had in their trust account was considered compensation, wouldn't you have to declare that on your tax returns? It defies the very purpose of a trust. But isn't it true that you withdrew money from the trust fund before all services were performed? Okay. This goes back to what the practice guide said. I drew money down as discrete aspects of work were performed in accordance with my retainer agreement. Okay. So how does that accord with the statute? Because with respect to realtors, there's a specific provision that says that they cannot, I can't think of the terminology they used, that they can't, in common parlance, we called it bundled or unbundled. But the statute is written differently for realtors. And in attorneys, it's contemplated that they would be drawing down after discrete parts of the work were performed. How do you draw the conclusion that that was contemplated? I mean, I think the statute doesn't seem to have any exception that I can see for any kind of payment until all services, all contemplated services were completed. Well, if you take the services and arrange them into discrete categories, I was a bankruptcy attorney for many years. Your Honor, many times people who represent clients in Chapter 7 matters, what they do is you sign a retainer agreement for the attorney to prepare the bankruptcy schedules and appear at the 341A. Then, if you want that attorney to appear on your behalf in any adversary actions, that's a separate engagement. And that's the way I set up my loan modification retainer agreement. I'm somewhat familiar with bankruptcy procedure, not to the extent you are, but there's no provision in the bankruptcy law like 2944.7 that says you can't receive any compensation until after the person has fully performed each and every service the person contracted to perform. Yes, and if you have distinct contracts, if you have discrete segments of work, and you complete that work and you draw down for that, I think that's called the unbundling. And that's the portion, that's the portion that the authors of the practice guide specifically said. And I should have photocopied that. That is the section that the authors of the practice guide said that the review department got wrong. Because in business and professions code 10026, they said you could not break up, you could not break up services into discrete elements like that. It specifically said that. That provision does not, is not included in the section governing attorneys. And there's two different sections of the law governing attorneys and that governing real estate licensees. How is that, you know, how is that consistent with the statutory provision that reads that you can't receive any compensation until after the person has fully performed each and every service the person contracted to perform or represented that he or she would perform. So you have a, you had a loan, you had your loan modification, residential loan modification retrainer agreement that listed a whole bunch, it listed three sets of services that you would do. And what I don't get is the unbundling in light of this each and every service language in the statute. Well, if you take the contract, if you take those as segments of the contract, I mean, I guess that's where we have a disagreement and I wish I could, if I had that practice guide section. I mean, certainly these. I will definitely take a look at that. But okay, so what steps did you take when the statute came in? I know you had your experience as a bankruptcy lawyer and you're familiar with real estate transaction work generally. Okay. So what, did you consult with anyone or seek advice from the bar or anything about whether this, whether your retainer agreement conformed with the statute? Number one, the bar said putting money in a trust account with compensation. I didn't agree with that. I still don't agree with it. It's just wrong. Well, how about withdrawing money from the trust account? The state bar, until 2012, condoned that procedure. And in fact, Jane Kim closed a lot of cases because of that. That was condoned and then the state bar changed positions. What's the authority for that they condoned it before 2012? My own experience, and there was a case before the Central District of California, which I think I can pull out. I don't have it off the top of my head, but I have it here with me, where the state bar actually reversed positions. I had conversations with the state bar about that because I thought they were stopped from changing positions. I also used it in my argument that the statute was void for vagueness because the state bar itself had taken inconsistent positions with respect to that very position. So I know Taylor. I know what the position they took in Taylor, but now you're telling me that there was some pre-Taylor ruling on this very point? Yes, yes. The state bar changed positions. So I know Taylor. What I don't know is what the other position was that you're telling me they changed from. So I think this is very important. Okay. So rather than have you scramble right now, I'm going to give you an opportunity to file a post-hearing submission in which I would ask you to explain to me this point, and I think this is a very important point, for you to specifically identify the ruling of the state bar on which you relied that authorized you to offer unbundled services. Okay. I don't want the court to misunderstand. This was the position that the state bar had taken in a case pending in the central district. They had taken a position which was contrary to the position they later took in Squazzie-Taylor. Okay. That's fine. So my question is whether you reasonably relied on some – I did not see this. I looked through this material. This is the first time that I am aware of your contention now that you relied on some legal authority in constructing your loan modification agreement that provided you with cover, because certainly that's not in the decision of the executive department or Judge Mazda's decision. This is my petition for review to the California Supreme Court. It's certainly in here. Okay. I have not studied that. Yeah. Yeah. And I did not raise that before the Ninth Circuit. Again, I wasn't quite sure how deep into this the Ninth Circuit wanted to get without re-arguing everything I did before the California Supreme Court. You are entitled to show that the facts upon which the discipline was imposed were so infirm that the court shouldn't respect them. Now, if you could establish by clear and convincing evidence that there was authority that you relied on that allowed you in good faith to proceed as you did and that along came Taylor and caught you by surprise and that after Taylor you did not make reasonable modifications based upon what Taylor said, then that might satisfy that criteria. Your Honor, Taylor was decided in November 2012. I know because it came down the day after my trial. Okay. And I did not accept any new loan modification clients after March 2011. And the reason I didn't is because I had only intended to provide loan modification services for the initial term of the Obama plan. And that was initially set to expire December 31, 2012. As it so happened, they extended it. But I knew that it took so long to get a loan modification that I was winding my practice down after March 2011. So I wasn't taking any new cases after Swazi Taylor came down in November 2012. So the position of the State Bar Court was that, oh, Taylor, as I read it, Taylor says what the law is, was, has always been. It's clear from the statute. That's kind of the way it reads. Now you're telling me that there was other authority in which you reasonably relied before that guided your decision to structure your loan modification return agreement as you did and that you believed entitled you to make withdrawals from the trust account as you completed each aspect of your representation. Yes? You understand what I'm saying? Yes. So now you have to, I'm going to give you time to file a supplemental filing to me to establish that point. You understand what I'm getting at here? Absolutely, Your Honor, and I appreciate that very much. Yeah, okay. I'll be interested to see what you have to say. I can do it. I can do it. Yeah. Okay, let me, you know, I get the basic points you're raising about the California Bar System, the procedure, the Supreme Court review. This is not the first time this issue has come before me. There are regrettably other California state reciprocal discipline matters that come here, and I'm aware of the problems. I don't know that they've ever been articulated as clearly as you have, but I'm generally aware of it, and I'm also guided by your submissions here and in the other case. Okay. Let me move to some questions, and I promise I'll let you go back to where I interrupted you if you want to add some more. But let me throw in a few blanks. Let me, just for my own benefit, get a little bit of your biographical background. Let me start with your college graduation date. 1976. And where did you go? I'm an Iowa farm girl, and I graduated from the University of South Dakota. And that's acceptable for an Iowa girl to go to South Dakota? Well, it is when you live near Sioux City. You know where Sioux City is. Somewhere in the middle. No, no, no, no, it's on the very river. In the middle of the country. I'm a bi-coastal kind of guy. Okay. And then law school? Dirk University in Des Moines. Okay. 1979. Okay. And after you graduated, I take it you sat for the Iowa Bar, is that correct? Yes. And when did you get admitted? May 1979. Oh, was that as a result of graduating? No. We had to take the bar immediately after graduation. Okay. And then what was your employment? I worked for eight years at the Davis Hockenberg firm in Des Moines. It was the largest firm in the state at the time. I'm not sure that's still the current name of the firm. And what kind of practice was that? I was a commercial lawyer. Litigator? Litigator. Litigator. And what I started doing was foreclosing on Iowa farmers, and then Iowa farmers would go into Chapter 11 and I'd follow them into Chapter 11. And that's one of the reasons I moved to California in 1987, because I needed some diversity in my practice. At least Chapter 11 work out here involved different subject matters. Okay. And when you moved to California, where did you work? I first worked at a clerk for Dan and Gil, and then I was hired. Dan and Gil is that a firm? I apologize, Your Honor. I'm sorry. In Los Angeles, these firms would mean something like that. Yes, Dan and Gil was a bankruptcy boutique firm. Okay. Okay. And then I worked for Cox, Castle, and Nicholson, which I think has a branch in San Francisco now. They're very much a real estate firm. And were you doing bankruptcy or real estate then? Well, as Bill Nicholson would say, behind every case is dirt in that firm. So bankruptcy with real estate. Okay. And how long were you at Dan and Gil? I just clerked there until I got my bar results, and then I worked for Cox, Castle, and Nicholson for two or three years. I mean, we're going back now 25, 30 years. 1987 to 89? 88 to 90? Something like that. Okay. Yeah, I think it was 89 to 93, something like that. And when were you admitted to the California Bar? December 1987. Okay. And so what happened after Cox, Castle? Then I moved. I was living on the west side, and then I moved to the valley, and I wanted to be closer to where I lived because the L.A. I mean, coming from Iowa, the L.A. traffic was just overwhelming to me. So I worked for a firm in the valley for three years, and I was trying to start a bankruptcy practice there, but that didn't quite pan out. So then I moved to Silmire Kubits, which was a bankruptcy firm downtown, and I was with them for about nine or ten years. So we're about now, about 2006 or so? 2003, and I'm a single woman with no children, so at that point I thought, well, when I first interviewed on the west coast, I was thinking either Los Angeles or San Diego. And I had some feelers in San Diego, so I interviewed with a firm down there and actually got an offer. And so I thought, well, let's go to San Diego. I was still thinking that I might meet Mr. Wright. I mean, this is back when I was still thinking that I might get married. So that kind of influenced my thinking, too. It wasn't just professional. It was kind of socially. And so I moved to San Diego, and I missed Los Angeles so much. I was coming back every six weeks. That kind of convinced me I had turned the corner and was really an Angeleno. Was that the Silmire firm? Was that in L.A.? Silmire was in Los Angeles, and then I was with Sullivan Hill for three years in San Diego, and then I came back to Los Angeles. OK. And that was 2006? Yeah. And then I started with a Shepherd Mullin in 2007. You did bankruptcy there? No, I did real estate transactional work. OK. Because I wanted to get out of litigation. I had just burned out on litigation. So you've been a lawyer for 20 years, and you then hired at Shepherd and Mullin, huh? That's pretty good. Well, you've been a California lawyer for 20 years at that time. Right. Yeah. Well, Shepherd Mullin represented a lot of lenders, and I thought that was just great.  and I did not have a stable of clients. I was a high-priced worker bee, and their lenders weren't making any more new loans. So I don't know if your Honor remembers 2000, 2008, 2009. It was a very scary time among law firms. I'd been around a long time. I'd seen pay freezes at law firms. I never saw pay cuts. Major law firms were doing 15% pay cuts, and a lot of people were laid off, and I got laid off in June 2009 just because there was no work. And so I looked around and thought what I could do, and I saw loan modifications were really, really hot at that time, and I knew a lot about lending practices, the internal structure of lenders, because actually my supervising attorney at Shepherd Mullin had been loaned out to Bank of America for one year to work internally at Bank of America, so I worked directly under him, so I was really savvy as to how the internal practices of lenders worked. And one thing that the review department and the state bar courts, I don't know, either intentionally or unintentionally, don't seem to get is the loan modification process did not affect the mortgage. I mean, it affected the mortgage, but you did not have to know state law. It was the loan that was being modified, and the HAMP involved uniform national lending standards. It did not involve the underlying mortgage, because as I tried to argue to them, if you were affecting the mortgage, you would have had 50 different standards, rules governing different state law. It was uniform application, the same guidelines that applied to somebody in Massachusetts would apply to a borrower in California. I therefore thought I fit neatly within the multi-jurisdictional practice rules, which the review department disagreed with. And the review department misconstrued the multi-jurisdictional practice rules, totally ignored the official comments that support my position. And the official comments were adopted by the states. The states had the option of either adopting the official comments or not. And yet, although I argued that to the state bar court, completely ignored the official comments, which I consider the most persuasive interpretation of the multi-jurisdictional practice rules. Okay, let me go back a little bit now to the beginning of the proceedings against you. You told me a little while ago that there were 30 complaints filed against you. And I think you also said earlier that you performed your part in each and every one of these loan modification retainer agreements. Is that correct? Yes. So how is it that 30, if you actually did what you were contracted to do, how is it that 30 of your clients filed complaints, not one or two or three or even five or six, but 30? How do you explain that? What happened? People are desperate. And they want their money back. You didn't get me a loan modification. Give me my money back. Are these all instances where you did not achieve the loan modification? Yes. Most of them. I would say with two or three exceptions. I couldn't achieve the loan modification either because they threw in the towel too early, they just got tired of the process, because they had given me false information, or they had interfered with the process somehow. Okay. So let's go back to the California, and that's true of the California, the four California complainants? Yes. So let me ask you again. So how does it jibe with the statute? How do you read the statute, that 2944.7, which says, no money shall be paid unless each and every service is completed? And in those cases, you were not able to achieve a loan modification. You're going back to the argument that you bundle or unbundle the statute, and if you just did step one and two, or just step one, you would be entitled to some of the agreement money, even if you weren't able to fully achieve the loan modification? Well, if the client prevents you from finishing the assignment, and you have done all the work that you possibly can, I think you have earned your fee. The thing is, I didn't charge by the hour, because these people could not have afforded an hourly fee. I charged a flat fee, and I completed the work. I said, okay, for this part of the services, it will be X dollars. I lost money on absolutely every file. I lost everything. I understand the answer. So, and then let me, all right, take me through what happened with that arbitration. How did that arise, and how did the arbitration arise? Your Honor, I want to go back, because I want to make sure that, since I'm under oath, I didn't misstate something. There were initially 34, and now four were dismissed. All right, two from Hawaii, two from Colorado. I'm fine with that. Okay. So tell me about the arbitration. How did the case go to arbitration, and what happened? Okay. Actually, this gentleman used, he was a citizen of Maryland, and he was one of those people that he had, you have to have a financial hardship in order to get a loan modification under HAMP. And this gentleman had several investment properties, which we later discovered. Okay. So we had a real problem with that. And then he wanted his money back, and I said, I could not give him all his money back, because I had done all the work. And there's a carve-out in my retainer agreement that you represent that what you tell me is true and correct, because I'm proceeding on that basis. And he did not, I just caught him in a lie. And, of course, one thing led to another, and tempers flared. And then he wanted his money back, and he was going to do everything in his power. And so he filed an arbitration. But he based it on 2944.7. He's from Maryland. Right. The state bar takes the position that 2944.7 does not apply to out-of-state clients. Okay. So we did an Orange County arbitrator. And, of course, under the guidelines, he didn't really have much recourse. He had to find against me, because the state bar had taken a certain position. I should have appealed it to the superior court, but at that time I was trying to wind down my business, and I put my client's interests ahead of mine. I just did not get around to it. And I'm paying a very, very heavy price for that. So, I mean, what happened after that? I tried to work out. Okay. You wanted to pay $200 a month, and they wanted $5,000 right now. Okay. As I told you, Your Honor, I lost money on every file. I had bills to pay. This isn't like money goes in my pocket. I'm not asserting that. I'm trying to understand the facts. So the arbitrator, I take it, concluded that you were required to pay $5,000 in one lump sum now. Am I correct? No. No. The arbitrator found against me. Okay. Fine. This is the judgment. Then there's a procedure under the Business and Professions Code that says the State Bar can help a client collect his fee. And there's a presiding arbitrator who's different than the decision-maker arbitrator. He's an official with the State Bar. And during this time, I was trying to work out something with Walter Clark to try and pay him some money. I did not have a whole lot of extra money at that point. I was trying to wind down my business, get back on my feet, and I was doing the best I could. But he was adamant in his position that he wanted all the money at once. And I said, Walter, it might as well be $5 million. I don't have $5,000. I'm just doing the best I can. I'm trying to get back on my feet. He didn't care. Now, under the Business and Professions Code, it's either it's up to the presiding arbitrator or the client. They can agree to a payment plan. Now, what did the presiding arbitrator do? He always deferred to Mr. Clark because Mr. Clark would not move off $5,000. He wouldn't either. And we went back and forth, back and forth. And then finally, the presiding arbitrator, and this was a shock to me, filed a motion to transfer me to involuntary enrollment, which is basically suspending my license. I was on food stamps. I was on government-sponsored health care because on top of everything else, I had fallen down a set of cement steps at the Los Angeles courthouse and broken my heel. Do you know how hard it is to break your heel? So I was disabled. I submitted uncontroverted evidence, nothing that was challenged by the presiding arbitrator, that I could not pay it. So what was the next step after you received notice that you'd been involuntarily inactive? Well, he had to file a motion. And then I responded. Is this at the state bar court? Yes. In front of Judge Miles. Same judge. And because the business and professions code says, shall not be enforced if the attorney submits evidence that she's unable to pay. Right. I saw that in your brief in the other case. It's out against me. All right. So upheld the involuntary inactive status. Then did you appeal that from there? Yes. To the review department? Yes. And I take it they affirmed. No, they summarily denied it. Summarily denied your position. And then did you go to the California Supreme Court in that one? Oh, obviously you did because that's your issue that you're raising. Yeah. Summarily denied. All right. OK. That clarifies that procedural status. Yes. OK. So in your case on the loan modification case, did the State Bar rely on the facts or outcomes of those 30 to 34 clients in presenting evidence on the loan modification case? I'm sorry. I don't understand. Did the State Bar either introduce any of the clients as witnesses or present documentary evidence about the representations or the loan modifications about all 30 of those or any of those? No, Your Honor. So, well, they must have presented the loan modification agreement. Yes. Did they do it for all of them? Yes. Had the agreements in? Yes. But nobody testified against you? No. You had character witnesses that testified in support of you, though, right? Yes. All right. OK. Did the State Bar require you to identify all of the clients with whom you had loan modification retainer agreements? No. That strikes me as odd that they wouldn't have done that. OK. So the Bar never asked you for information concerning all of them, all of the folks who you provided loan modification services for? No. They acted upon the complaints. Just the complaints. Because most of my clients were happy and pleased with my work. So let's put this in perspective. Say there's 30 disgruntled clients for whom you were unable to get loan modifications. How many clients did you have for whom you successfully got loan modifications? 850. I think that's a pretty astounding record, if you knew what I had to deal with. OK. Now, what this tells me is now that not one client of yours testified against you at the State Bar proceeding. Is that your...? In this action, yes. Was there another action where...? Well, I'm talking about Walter Clark. He did not appear. He testified via telephone, which of course I objected to because the demeanor and all, but that came in, too. He was the only client who testified in any way in the proceeding? Well, he was also a complaining party in 10888. And what's that? That's the one... The fee arbitration thing? No, that's the disciplinary proceeding. He was also a party in that. And then he also filed this arbitration. Right, right. So in the disciplinary proceeding? Yeah, he was a party there, too. He was in the disciplinary proceeding? Right, but... Was he the only complaining witness who testified? He did not testify in that. Oh, I thought you said he appeared by telephone. In the arbitration. Oh, I see. OK, OK. But nobody in the disciplinary proceeding, no client testified against you? Right. OK. So, but you did have... How many clients testified in your... on your behalf? Four. Four. Did the State Bar examine them about the quality of your representation and the success that you achieved in that? Yes. And were they... Were you successful in getting loan modifications for all of them? Yes. And were any of them subject to contracts that were entered into after 2944.7 took effect? All of them were. OK. But you weren't required to pay restitution to them because they weren't complaining witnesses, correct? I don't know what the motivation of the State Bar was. They did not file charges based on those complaints. So the only restitution that you've been ordered to pay was for those witnesses who filed complaints against you and for whom you were unsuccessful in getting loan modifications. Do I have it right? Yes. OK. Well, not all of the 30 was I unsuccessful for. I mean, I'd have to go back and check that. I mean, I think there are two or three I did get loan modifications. They still file complaints against me because if they knew there was money to be had and they knew about this statute because, believe me, the State Bar plastered it all over its website and basically invited people to file complaints against people providing loan modification services, basically encouraging clients to file complaints against their attorneys. So at some point you changed the form you used for agreements with out-of-state clients and you added that paragraph that talks about that the agreement would be governed by California law and that you're providing legal services based on federal law. You know what I'm talking about, right? Yeah, in accordance with 535. When did you make that change and what prompted you to make that change? I had a complaint filed against me from somebody in Tennessee, and I retained Tennessee counsel, and Tennessee counsel agreed that I fell within the safe harbor and that it would probably be a good idea from then on out to change my retainer agreement, which is what I did, and the State Bar did not proceed based on that complaint. In that supplemental filing that you're talking about, your understanding of the State Bar's interpretation of 2944.7 pre-Taylor, did you present evidence about your thinking and your analysis of 2944.7 in light of the State Bar ruling in the disciplinary proceeding? Your Honor, in my initial trial in November of 2012, I was represented by counsel, David Carr, and all I can tell you is he saw things differently than I did, and if I had tried the case myself, it would have been tried differently. So in other words, I think he answers no, that that was not part of your trial strategy at that time. Correct. Okay. So any guidance that the State Bar may have provided, anything that you relied on between 2944.7 and Taylor is what I want you to address. Yes, Your Honor. I most certainly relied on it. It should have come out in my trial, and it didn't. It should have. I most certainly relied on it. Okay. Do you know what the State Bar Court's legal basis was for order and restitution in the California cases, for the California client? Well, they considered it an illegal fee. Well, yeah, it says, I mean, I just read it, but it's kind of based on a timing. Well, yeah, okay. I asked, when I wrote this question out, I was operating under the assumption that you had succeeded in getting loan modifications for those four folks, but you weren't, so then the answer to my question is obvious. No, of those two people, I did. Two of them. Okay, let's talk about those two where I suppose you could say they received everything they bargained for in terms of the services that they contracted for you. The sin, if any, was that they may have paid for it sooner than the statute, under at least Taylor's ruling, they had to pay for it earlier than they might otherwise have had to pay for it. But I'm just, I was kind of curious to know whether the State Bar ever rationalized that notion, at least as to those two. Your Honor, the State Bar is a very broad brush, very broad brush. And I'm glad you brought this up because one of the four California clients was named Christopher Mamarelli. The statute says that 2944.7 only applies when the retainer is paid or the compensation is paid, quote, by the borrower, uses that language, by the borrower. In Mr. Mamarelli's case, the retainer, and there's no dispute about this in the record, the retainer was paid by a third party. So I argued, okay, State Bar, you want to take a literal interpretation of 2944.7, then you should be bound by the borrower. Miles ruled against me. I raised that point to the review department. Judge Rimke did not even mention it. So that's one of the... You raised it in the first level, the trial? Yes, yes. And did Judge Miles address that? Yes. He just made some excuse for it that, oh, well, it wasn't intended that way. It was a very weak argument. I mean, it's in the decision, what he did with it. But it was a very weak argument, which, you know, I certainly attacked on appeal. But there was not even any mention of it in the review department's decision. Right. I guess my last question is kind of a practical question. As I mentioned at the very outset, the only stake here is your ability to practice in the Ninth Circuit. And just I'm wondering whether you have any expectation, actually practicing in the Ninth Circuit. I know it would be nice to get some sort of favorable ruling for you, but I'm just wondering whether as a practical matter you have any expectation of practicing in this court in the future. I don't know what the future holds. I'm 61, almost 61. I'm 61 in June. I certainly never thought that this would happen to me within the last five years either. So as a practical matter, yes, I'm getting older every day. That was not an age-related comment or question. No, I wouldn't hold that against you, no. Not that sensitive. But I mean, how often did I appear in front of the Ninth Circuit? It's not like most attorneys have a thriving Ninth Circuit practice. I never did. How many times have you appeared at the Ninth Circuit? I don't think I've appeared in oral argument ever. I think I filed briefs maybe three times in the Ninth Circuit. Well, I don't have any other questions for you now. And I know I did interrupt your argument earlier on the various issues concerning the problems that you perceived with the California disciplinary process. I think I am familiar with those. I don't think I need you to do that for my benefit. And as I mentioned earlier, I think I'm going to be forced to defer to the panel's evaluation of the legal arguments. On that point, my decision would have really no presidential value. They would not pay attention. But is there anything else that you wish to add before we conclude this afternoon? No, Your Honor. You've been very patient, and I think your questions have been excellent. And part of the reason I wanted to appear in front of this Court is because I wanted to learn the weaknesses in my case. Because I have tried to do the right thing, believe it or not, all along, and I'm shocked that I'm in this position. That is why I feel so strongly about California Rule of Court 9.16, because I don't think I would be in this position if I had had an actual court, true court review this. Because things have happened to me I never thought could happen. But I'm grateful for the opportunity to further brief the Court's questions How much time would you request to submit a supplemental file? Let's see. Could I have a week? Oh, yes. You can have until the end of next week if you think. I'll be extra generous. Well, because if I mail it from Los Angeles, it's not going to get here. So if I can serve it next Friday. Are you admitted to the bar tonight? Oh, you must be admitted. Do you not have e-filing privileges with the Court? Do you know what I'm talking about? Yes, Your Honor. I'm poor. I don't have that. You don't have access to a computer to file? Well, I don't know how to do e-filing. All of your filings have been by paper in this matter? Yes, Your Honor. Okay. Well, for this purpose, I'm not going to require you to go through a big rigmarole to do that. I'll accept the paper filing. That's fine. Whatever amount of time you need is fine. A week is fine. More than a week is fine. It is a fairly narrow point that I'm asking for, though. No, and my only problem is it's not like I just whip into the law library. I've got to go downtown to the Los Angeles County Law Library. I don't have access to LexisNexis and all that. So it's a matter of me going downtown. Okay. So you tell me what time it is for you. No, if I can serve it by next Friday, that means you should have it the following Monday. Okay. That's fine. We will defer submission of this case until I receive that from you, and I'll count on receiving it. Let's see. This would be March 9th. It would be a week from Monday. Okay. And while you're at it, the question I asked you referred to your reliance on the governing California State interpretation of 2944.7. But I guess the other aspect of this is the multi-state issue. So I would expand my request for you to address the legal basis on which you, whether you knew of any state bar ruling or established state court ruling on the multi-jurisdictional points that you relied on in creating a retainer agreement and providing services, that you believed that you were entitled to do so in the multi-district. Yes. All right. Okay. Do you have any other questions or comments? No, Your Honor. Okay. Well, thank you for traveling and appearing today. I wish you good luck. This matter is deferred pending further filing. And I'll then prepare a report of recommendation that you receive before it gets submitted to a three-judge panel. Thank you.
judges: Appellate Commissioner Shaw